IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


KAREN J. SAMPSON,

          Plaintiff,

    v.                                    Civil Action No.5:07-CV-73


MICHAEL J. ASTRUE,
Commissioner of Social Security,

          Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.     Background

      Plaintiff, Karen J. Sampson, (Claimant), filed her Complaint on June 4, 2007 seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3) of an adverse decision by

Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer

on August 17, 2007.[2]  Claimant filed her Motion for Summary Judgment on August 29, 2007.[3]

Commissioner filed his Motion for Summary Judgment on October 17, 2007.[4]

B.     The Pleadings

      1.     Plaintiff's Brief In Support of Motion for Summary Judgment.

      2.     Defendant's Brief In Support of Defendant's Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 12.

[3] Docket No. 17.

[4] Docket No. 18.

C.     Recommendation

I recommend that:

1.     Claimant's Motion for Summary Judgment be DENIED because the ALJ properly determined Claimant's mental impairments were not severe, did not have a duty to obtain additional medical evidence, and properly considered the impact of Claimant's mental impairments on her ability to work when determining Claimant's RFC.  Additionally, the ALJ's determination of Claimant's RFC is supported by substantial evidence, including the opinions of Drs. Ahmed, Hay, and Garner.

2.     Commissioner's Motion for Summary Judgment be GRANTED for the same reasons stated above.

## II.  Facts

A.     Procedural History

Claimant filed an application for Disability Insurance Benefits on July 28, 2003, alleging disability since July 11, 2003 due to pinched nerves and muscle spasms in her neck and spine and arthritis and carpal tunnel in both her hands.  (Tr. 100).  Her application was initially denied on December 16, 2003 and upon reconsideration on July 6, 2004.  Claimant requested a hearing before an Administrative Law Judge, ["ALJ"], and received a hearing on July 20, 2005.  A supplemental hearing was held on April 20, 2006 after the receipt of additional evidence.  On July 27, 2006, the ALJ issued a decision adverse to Claimant.  Claimant requested review by the Appeals Council and submitted additional evidence in support of her appeal.  The Appeals Council denied review and Claimant filed this action, which proceeded as set forth above.

B.     Personal History

Claimant was 44-years-old on the date of the July 20, 2005 hearing and 45-years-old on the date of the April 20, 2006 supplemental hearing before the ALJ. Claimant obtained her GED and has prior work activity as a dump truck and tractor trailer driver and as a convenience store clerk.

C.     <u>Medical History</u>

The following medical history is relevant to the time period during which the ALJ concluded Claimant was not under a disability: July 11, 2003 through July 27, 2006.

**<u>Dr. John M. Kerr, Jr. M.D., 5/15/98, (Tr. 177)</u>**
<u>Diagnoses</u>: Right carpal tunnel syndrome.
<u>Procedure</u>: Right carpal tunnel release.

**<u>Dr. John M. Kerr, Jr., M.D., 6/15/98, (Tr. 172)</u>**
<u>Diagnoses</u>: Left carpal tunnel syndrome.
<u>Procedure</u>: Left carpal tunnel release.

**<u>Albemarle Hospital, 4/4/00, (Tr. 183)</u>**
-MRI Scan of cervical spine.
-The cervical spine is straight with a normal cervical lordosis.
-At C3-4, posterolateral osteophytes on the right have narrowed the neural foramen on the right.
-At L4-5, posterolateral osteophytes have narrowed the neural foramen on the right.
-At C6-7, the disc space is mildly narrowed, posterior osteophytes mildly encroach upon the subarachnoid space at this level, but the spinal cord is not deviated.
-Spinal cord signal is normal, throughout, vertebral body signal is normal.
Impression:
      1) Right neuroforaminal stenosis at C3-4 and C4-5.
      2) Small posterior osteophytes encroaching upon the anterior subarachnoid space at C6-7.

**<u>Albemarle Hospital, 5/3/00, (Tr. 184)</u>**
-There is a tear in the medical meniscus which extends to the inferior surface of the meniscus.
-No body signal abnormalities are identified.
-<u>Impression</u>:
      1) Knee effusion.
      2) Strain of the posterior cruciate ligament, but most of the fibers are intact.
      3) Tear of the posterior horn of the medial meniscus extending out to its inferior surface.

**<u>Karl W. Hubbard, M.D., 5/26/00, Tr. 186</u>**
-Preoperative diagnosis: MRI diagnoses small tear, medial meniscus.
-Postoperative diagnosis: Small tear, medial meniscus.

**Dr. Sharat K. Narayanan, M.D., 8/4/03, (Tr. 203)**
Extremeties: Show no edema.  Peripheral pulses are trace bilaterally.  Examination of both knees and ankles, unremarkable.  Examination of the right hip is remarkable for limitation of movement, especially on abduction.  She complains of pain on forced abduction at the right hip.  The left hip is generally unremarkable.  Flexion of the right hip is again limited by pain.  The patient is unable to elevate the right lower extremity off the bed more than 5 degrees above horizontal.
Assessment: 1) Right hip pain.  2) Tobacco abuse.

**Lynn Maggard, RN, MSN, FNP, 11/3/03, (Tr. 210)**
Assessment: 1) Constipation.  2) Family history of colon cancer in her mother.
Plan:
1) Colonoscopy for December 8, 2003, at Clinch Valley Medical Center.  Instructions with prep given.  Risks and benefits of procedure explained to patient.  Instructed patient to hold aspirin and vitamin E products one week prior to procedure.
2) Encouraged patient to increase fiber in diet with use of such products as Metamucil.

**Susan Robins, D.O., 7/21/03, (Tr. 213)**
Physical Examination: Extremities: There is no cyanosis, clubbing or edema noted. . . . The right hip pain is increased with internal/external rotation of the right hip although she does seem to have good range of motion. DTRs are +2/4 bilaterally.  Sensation is decreased in the right lower extremity, but in a nondermatomal pattern.
Assessment: 1) Right hip pain.
Plan:
1) Obtain x-ray of right hip and lumbar spine.
2) Bextra 10 mg once to twice daily, #30 with no refills.
3) Ultracet one q.i.d.p.r.n., #40 with no refills.
4) She is to return in two weeks for recheck or sooner should she have any problems.

**Larry G. Mitchell, M.D., 5/20/03, (Tr. 215)**
Observation: Examination of back reveals tenderness to palpation over the lumbar spine, from around the L2 to L5 area. There is also tenderness and spasm in the paralumbar muscles bilaterally and limitation of range of motion on forward flexion to about 45 degrees.  Lower extremities reveal a free range of motion.  Deep tendon reflexes are 2+ and symmetrical in the knee and ankles.
Assessment: 1) Exacerbation of chronic back pain, secondary to injury.

**Basim Antoun, M.D., 7/21/03, (Tr. 216)**
Roentgenologic Report: Lumbar spine series, pelvis, and right hip, 7/21/03.
-The alignment of the vertebral bodies is anatomic.  The disc spaces are of normal height.  The

pedicles and transverses processes preserved.
-The pelvic bony framework is intact. The femoral head maintains anatomical alignment with the acetabulum. There is normal thickness of the joint space without fractures, lytic or blastic lesions. Mild irregularity in the right inferior pubic ramus is present; its clinica; significance is uncertain.

Impression:
1) Unremarkable plain film of the lumbar spine.
2) There are no acute bony abnormalities noted in the right hip.
3) Multiple calcifications are seen in the pelvis most of which is compatible with phleboliths however a distal ureteral stone cannot be definitively ruled out.

**Nancy Hallo, M.D., 12/31/03, (Tr. 226)**
Conclusion: Minimal disc bulge with associated spondylytic ridging is present at the C6-C7 level. This is not causing any cord compression or significant degree of central stenosis. The remainder of the MRI study of the cervical spine is within normal limits.

**Nripendra C. Devanath, M.D., 10/28/03, (Tr. 227)**
Impression:
1) At L5-S1 level only mild degenerative changes of facet joints are noted but there is no other diagnostic findings. No obvious stenosis or neural foramina.
2) At L4-L5 level mild asymmetric left posterolateral broad-base disc bulge accounting for mild stenosis of left lateral recess and left lateral foramen. No other diagnostic finding at this level.
3) At L2-L3 mild to moderate degenerative disk disease. There is no left paracentral focal disk herniation with mild mass effect to thecal sac. No obvious neural foraminal stenosis at this level.
4) No intrathecal abnormality.

**Nripendra C. Devanath, M.D., 10/27/03, (Tr. 230)**
Impression:
1) Moderate effusion in right hip joint without any other specific diagnostic finding.
2) Left hip joint appears to be normal.

**Nripendra C. Devanath, M.D., 9/2/03, (Tr. 231)**
-History: pain in right hip.
-No evidence of acute fractures or dislocation are seen. The soft tissues are unremarkable.
Conclusion: No acute fractures are seen at this time. If clinical symptoms are persistent, please repeat radiograph after five to seven days.

**Nripendra C. Devanath, M.D., 9/2/03, (Tr. 232)**
-The study shows minimal levoscoliosis in lumbar spine. The vertebral bodies are of normal heights. There are findings of moderate or mild to moderate degenerative disk disease at L2-L3

and milder degenerative disk disease at L3-L4 and L4-L5 levels. There appears to be mild facet joint degenerative changes at L5-S1 level. There is no fracture or dislocation.

Impression: Multi-level mild DJD in lumbar spine as described. No acute fracture or dislocation.

**Dr. Ahmed, M.D., 2/16/04, (Tr. 237)**

Physical Capacities Evaluation

Can lift:

       up to 5 lbs continuously

       6-10 lbs frequently

       11-20 lbs occasionally

       21-25 lbs never.

Can never carry 11-20 lbs.

Can use hands for repetitive tasks such as simple grasping, pushing and pulling or arm controls, fine manipulation.

Cannot use feet (right, left, or both) for repetitive movements as in pushing and pulling of leg controls.

Able to bend - occasionally

       squat - occasionally

       crawl - not at all

       climb - not at all

       reach - frequently

Restrictions of activities involving

       Unprotected heights - total

       Being around moving machinery - moderate

       Exposure to marked changes in temperature and humidity - moderate

       Driving automobile equipment - none

       Exposure to dust, fumes, and gases - none

**Dr. Haha Siddiqi, M.D., 3/16/04, (Tr. 239)**

Assessment: 1) Degenerative disc disease. 2) Anxiety disorder.

**DDS Physician, 7/6/04, (Tr. 240)**

Psychiatric Review Technique

-Medical Dispositions: Impairment(s) not severe.

-Category upon which the medical disposition is based: 12.06 Anxiety-related disorders

-Consultant's Notes: Disability is alleged due to mental problems. The evidence shows that the claimant is prescribed Xanax by her PCP for anxiety. She has no history of hospitalizations or outpatient treatment for mental health problems. Her ADLs are not significantly limited due to anxiety or depression. Based on the evidence of record, the claimant's statements are found to be partially credible. The claimant does not appear to have a severe mental impairment.

**Randal Hays, M.D., DDS Physician, 12/16/03, (Tr. 253)**
Residual Physical Functional Capacity Assessment
Exertional Limitations:
        Occasionally lift and/or carry 20 lbs.
        Frequently lift and/or carry 10 lbs.
        Stand and/or walk about 6 hours in an 8-hr workday.
        Sit for a total of about 6 hrs in an 8-hour workday.
        Push and/or pull unlimited.
Postural Limitations
        Climbing ramp/stairs: frequently
        Climbing ladder/rope/scaffolds: never
        Balancing: frequently
        Kneeling/Crouching/Crawling: Occasionally
Manipulative Limitations: none established
Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: Unlimited, except must avoid all exposure to hazards (machinery, heights, etc).
Treating or Examining Source Statements: Claimant's allegations are not fully credible according to the medical findings.

**George Mara, PA-C, 7/2/04, (Tr. 269)**
Impression: 1) Anxiety Disorder, 2) Chronic pain, 3) DDD with stenosis at least at the cervical level, awaiting MRI results which are apparently more recent and also more significant by history, 4) DJD, 5) tobacco abuse, 6) history of elevated LFTs, 7) COPD, 8) Chronic headaches.

**Myung-Sup Kim, M.D., 3/13/05, (Tr. 290)**
Findings: Irregularities are seen at the anterior costochondral junction of the left seventh rib suspicious for a nondisplaced fracture. The remainder of the left ribs are intact. Underlying lung and pleura are unremarkable.
Impression: Probable nondisplaced fracture at the costochondral junction of the left seventh rib.

**Myung-Sup Kim, M.D., 3/15/05, (Tr. 302)**
Indications: Extreme left back pain.
Findings: Cardiac silhouette is within normal limits. Hilar and mediastinal structures and lung fields are unremarkable. No evidence of acute parenchymal process is seen. Bony thorax as seen on this examination is also unremarkable.
Impression: Normal chest showing no change from 3/13/05.

**Myung-Sup Kim, M.D., 4/26/05, (Tr. 306)**
Indications: Low back pain.

Findings: Vertebral body height and intervertebral disc spaces are intact and normal alignment is seen. Minimal spondylosis is noted at L2-3 level.  Sacrum and sacroiliac joints are unremarkable.

Impression: 1) Minimal spondylosis at L2-3. 2) No evidence of acute bony injury is seen. Normal alignment is noted.

**Dr. Bennett, DO, West Virginia Dept of Health and Human Services, 3/3/05, (Tr. 309)**

Neurological: positive tinnel in both hands.

Psychiatric: Depressed

Orthopedic: Decreased range of motion - lumbar spine.

Diagnosis:

      Major: Degenerative disc disease; depression.

      Minor: bilateral carpal tunnel; osteoarthritis.

Is applicant able to work full time at customary occupation or like work?: No. Can not bend, lift, or carry.

Is applicant able to perform other full time work? No.  Must be able to change position frequently and as needed.

What work situations, if any, should be avoided?: Bending, lifting, carrying.

Duration of inability to work full time: Lifetime - no improvement expected.

Recommendations for further tests or treatment:

      Specialist's Consultations: Pain management

      Treatment: Physical therapy, medications.

Should applicant be referred for vocation rehabilitation? No.

**Susan Garner, M.D., 9/14/05, (Tr. 312)**

Physical examination: The claimant is a 45-year-old female that presents without assistive device or ambulatory aids.  She ambulates with a significant limp placing all her weight to her left hip. The claimant has no difficulty arising from a seated position and/or climbing up and down from the examination table.  The claimant appears comfortable while sitting but reports extreme discomfort while lying supine.  The claimant can speak understandably and hear and follow instructions without difficulty.

Extremities: The dorsalis pedis and posterior tibial pulses are palpable.  There are not bruits heard.  There is no evidence of peripheral vascular insufficiency or chronic venous stasis.  There is no clubbing, cyanosis or edema.

Cervical spine: She has complaints of pain on palpation of the cervical spine.  Her ability to laterally and anteriorly flex is decreased.  She says that she is unable to extend her neck to any extent.  She can rotate her head to only 40 degrees to the left and the right.

Hands: Examination of the hands reveals no tenderness, redness, warmth or swelling.  There is no atrophy and the claimant is able to make a fist bilaterally.  There are no Heberden or Bouchard nodes.  Grip strength measures 16 lbs of force on the right and 12 lbs of force on the left.  The claimant is able to button and pick up coins with either hands and write with the

dominant hand without difficulty.

Lumbosacral spine/hips: She complains of pain over the spinous processes in the lumbar region. She has no paravertebral muscle spasm. She is unable to bend forward at the waist past 30 degrees. She is unable to laterally flex past 10 degrees to the right and the left. Her straight left raise test is diminished to 10 degrees on the right and 60 degrees on the left. There is no leg length discrepancy. There is no tenderness to palpation on the hips. However, she is not able to abduct or adduct her right hip past 20 degrees.

Neurologic: On neurological examination, there is evidence of slight weakness in the upper and lower extremities. Her grip strength is diminished. Her efforts were only fair, however. Sensation was intact. The mid-biceps measures 28 centimeters on the right and 28 centimeters on the left. The mid-forearm measures 25 centimeters on the right and 25 centimeters on the left. The mid-thigh measures 48 centimeter s on the right and 48 centimeters on the left. The mid-calf measures 36 centimeters on the right and 36 centimeters on the left.

She was not able to heel walk, toe walk, heel-to-toe walk or squat and made poor attempts at doing so.

Impression: 1) Chronic neck and low back pain. 2) Arthralgias.

Summary:

This is a 45 year old female who was involved in an automobile accident in 1998. Since that time she has had pain in her beck, which radiates down to her low back. She has been told by an orthopedic surgeon that she has just soft tissue injury. There is nothing broken. She has not had any therapeutic interventions. She has had a number of MRIs that show mild degenerative changes in her cervical and lumbar spine and perhaps some bulging disks but no stenosis or foraminal impingement. On examination today she reported pain on range of motion throughout the shoulders but was able to complete the range of motion testing. She also had reported stiffness in her cervical spine and was unable to laterally and anteriorly flex her neck. She could not rotate her head past 40 degrees in either direction. In addition she would not bend anteriorly past 30 degrees or laterally past 10 degrees on her lumbar spine examination. She could not complete the straight leg raise test past 10 degrees on the right and 60 degrees on the left without reporting reproduction of her lumbar pain. Her upper and lower extremity strength was slightly diminished at 4+/5+, but her grip strength was 3+/5+ on testing.

She says that she was diagnosed with arthritis a number of years ago. She believes it was related to this car accident that she was in. She says that the pain is in all the joints of her body. It is worse in the right knee, however. On examination today I could appreciate no crepitus, warmth or swelling over any joints that she mentioned. She completed range of motion testing with the exception of the difficulties that were described in the above paragraph. She is not using an ambulatory device and was carrying a large package with radiographic materials to the examination. She has had various x-rays at a multitude of emergency room and primary care physician's offices in different joints that were basically normal with some evidence of degenerative changes in her cervical and lumbar spine. She did have an effusion in her right knee and underwent arthroscopic surgery in 2000. Her knee examination today was normal.

**Susan Garner, M.D., 10/6/05, (Tr. 320)**

Exertional Limitations

        Occasionally lift and/or carry 20 lbs

        Frequently lift and/or carry 10 lbs

        Stand and/or walk about 6 hrs in an 8-hour workday.

        Sit about 6 hours in an 8-hour workday.

        Push/pull limited in upper and lower extremities.

What medical/clinical findings support your conclusions in items 1-4 above?: Claimant alleges chronic back pain with numbness, tingling, weakness in both lower extremities. Lower extremity strength was mildly decreased on exam. She ambulates with difficulty. She reports inability to sit or stand for prolonged periods of time. Her upper extremity grip strength is decreased. She complains of pain with flexion and abduction of the shoulders.

Postural limitations:

        Climbing - never

        Balancing, kneeling, crouching, crawling, stooping: occasionally

        Reasons for limitations: Unable to climb due to lessening of mobility due to her lumbar
        pain in particular; would make climbing unsafe.

Manipulative limitations:

        Reaching all directions: limited to occasionally, because pain was elicited with reaching
        overhead on R.O.M. testing; however, she attempted and was able to complete the
        exercise.

        Handling/Fingering/Feeling: Unlimited

Visual/Communicative Limitations: Unlimited

Environmental Limitations: Unlimited

**Rainelle Medical Center, 2/6/06, (Tr. 334)**

Assessment: 1) Chronic pain, 2) R.A., 3) Anxiety, 4) Hep C, 5) Family history of ___.

**Colin Rose, M.D., 1/6/06, (Tr. 337)**

-There is moderate parenchymal tissue bilaterally. There is no evidence of malignancy.

Impression: No evidence of malignancy, breast Category II.

Category II: Benign Findings - Negative.

**Rainelle Medical Center, 1/6/06, (Tr. 338)**

Assessment: 1) Chronic pain, 2) R.A., 3) Anxiety, 4) Left shoulder pain, 5) Elevated LFTs.

**Rainelle Medical Center, 2/6/06, (Tr. 342)**

Assessment: 1) Chronic pain back, 2) RA, 3) Anxiety, 4) Left shoulder pain5) Previous med.

**Colin Rose, M.D., 1/6/06, (Tr. 345)**

Right hip (including a view of the pelvis): There is a very minor degenerative change in both hip

joints.

Left shoulder: There is a minor osteophytic lipping from the gelnoid margin.

<u>Impression</u>: Minor degenerative change.

**<u>Stephanie M, LCSW, Willow Ridge, 2/15/06, (Tr. 348)</u>**

<u>Mental Status</u>: <u>Affect:</u> flattened.  <u>Mood</u>: depressed.  <u>Suicidal</u>: no.  <u>Homicidal</u>: no.  <u>Speech</u>: normal.  <u>Psychomotor</u>: retarded.  <u>Thoughts</u>: scattered.  <u>IQ</u>: average.  <u>Memory</u>: normal.  <u>Insight</u>: good.  <u>Judgment</u>: normal.

<u>Diagnosis</u>:

      307.89

      300.00

      276.90

<u>Plan</u>: To continue taking medication; to continue individual psychotherapy; to learn stress management techniques.

**<u>Stephanie M, LCSW, Willow Ridge, 2/1/06, (Tr. 349)</u>**

<u>Mental Status</u>: <u>Affect:</u> flattened.  <u>Mood</u>: depressed.  <u>Suicidal</u>: no.  <u>Homicidal</u>: no.  <u>Speech</u>: normal.  <u>Psychomotor</u>: retarded.  <u>Thoughts</u>: normal/goal directed.  <u>IQ</u>: average.  <u>Memory</u>: normal.  <u>Insight</u>: good.  <u>Judgment</u>: normal.

<u>Diagnosis</u>:

      307.89

      300.00

      276.90

<u>Plan</u>: To continue taking medication; to continue individual psychotherapy; to learn stress management techniques.

**<u>Wassim Saikali, M.D., 2/15/06, (Tr. 351)</u>**

<u>Exam</u>: The patient has no swelling in MCPs, PIPs, wrists or elbows.  Has mild tenderness in the trapezia, nuchal area.

<u>Impression</u>: Rheumatoid factor positive in a patient with strong family history positive for rheumatoid arthritis.  She reports her mom has severe rheumatoid arthritis.  That could be why her rheumatoid factor is positive.  I don't see any evidence of swelling.  The patient wants to try something for possible rheumatoid.  I told her at this time there is no need for Methotrexate.  I don't see any swelling, but Plaquenil is a benign medication.  It might help with her joint pain in her hands.  She does have osteoarthritis.  She does have fibromyalgia-like symptoms.  Will re-evaluate in 3 months.  Side effects of Plaqueril were explained.  Will give her 1 Plaqueril a day.  Gave her Sonata 10 mg to sleep.  Side effects were explained including dizziness and drowsiness. I will see her back in 3 months.

**<u>Wassim Saikali, M.D., 1/24/06, (Tr. 352)</u>**

<u>Findings</u>: Bone is well mineralized.  No erosions seen in the MCPs or PIPs.  Carpal bones are normal.  There is some radial subluxation of the right third PIP.  Clinical correlation is

recommended.

**Wassim Saikali, M.D., 1/18/06, (Tr. 353)**

<u>Impression</u>: Questionable history of rheumatoid arthritis.  She reports she was told she had rheumatoid arthritis. I don't see any swelling today.  She has some tenderness in the PIPs. X-rays of the hands were done that showed no evidence of rheumatoid, i.e., no soft tissue swelling or erosions.  She does have osteoarthritis and most likely she has severe fibromyalgia because she has severe tenderness to touch.  At this time I will give her a medrol pack to see if that will help her with the joint pain.  I will check anti-CCP.  Will repeat rheumatoid factor as apparently it was not done recently.  Most of her pain is fibromyalgia and chronic pain syndrome.  I will recommend, since she has chronic back pain and injury, to be referred by her physician to a pain clinic.  If she has rheumatoid arthritis, I will start her on Methotrexate, but I doubt clinically that she does have that.  In my opinion most of her symptoms are osteoarthritis and fibromyalgia, but we ill re-evaluate.  I will see her back in 4 weeks.

**Dr. Joe Othman, M.D., 8/25/06, (Tr. 372)**

<u>Impression</u>: The EMG and NCS of both upper extremities revealed mild left carpal tunnel syndrome (borderline).  The right side is within normal limits.

D.      <u>Testimonial Evidence</u>

Testimony was taken at the July 20, 2005 and April 20, 2006 hearings.  The following portions of the testimony are relevant to the disposition of the case.[5]

HEARING #1: July 20, 2005

[EXAMINATION OF CLAIMANT BY ALJ]  (Tr. 378)

ALJ        And I'll listen to your testimony and then I'll make a decision.  You have a right to have an attorney with your or somebody else if you want to.  You don't have to if you don't want to.  But I want to give you every opportunity to do that if you want to go see about getting somebody to help you.  Sometimes Legal Aid helps, there in Lewisburg, help people that don't have a lot of financial resources.  Do you want to go ahead and have your hearing today or do you want to see about getting a, coming back in about a month or so?

_____

[5] Claimant appeared unrepresented by counsel at both hearings.  Accordingly, the hearings consistent of testimony from Claimant, the ALJ, and the Vocational Expert.

CLMT        No, I would like to go ahead and have it today.  I've had some rather shady run-ins with attorneys and I just don't know who else to trust to do this any better than I can, I reckon.

ALJ          Okay.  Well, it's totally up to you, but I, I do have to tell you about your rights, you know.  But, but I, I'm seeing that you, you moved up there from North Carolina?

CLMT        Yes, sir.

ALJ          The Legal Aid there in  Lewisberg  is very reputable, I will say that. They, they come over here, you know, a good bit.  But if you want to have your hearing today that's fine too.  It's up, totally up to you.

CLMT        It's pretty much like starting all over if I start getting a lawyer right now because it'll have to take six months for them to get things together where they can represent me. And I've, I'm already into to this so far that - -

ALJ          Okay, I'm not trying to convince you one way or another, I'm just telling you.  We can go ahead and have your hearing.  That's fine.

CLMT        I know, I know I've been, I've been told several times that I probably won't get a favorable decision if I'm not in the right kind of a doctor's care or if I'm not having an attorney represent me.  At this point I'm so frustrated with both professions that I don't know who's going to represent me better than me.

ALJ          Well, I you'll probably do a pretty good job.  It really doesn't make any difference to me whether you have a lawyer or not because I, I don't think that people are any more likely to get benefits with or without a lawyer, to tell you the truth.  But, anyway, it's up to you.  So we'll go ahead and we'll have your hearing today.  That's fine.

13

CLMT       Yes, sir.  Thank you.

                      *           *           *

Q       What have you been going through that's so hard?

A       Well, mainly it's just my health.  I mean, it's, it's deteriorating, you know, everyday it gets a little worse.

Q       What's wrong with you?

A       I've got a lot of severe pain in my back, a lot of headaches.  I have a problem walking and being stable on my, on my right leg, my right knee.  I, I have a hard time grasping with my hands.

                      *           *           *

Q       How far did you go in school?

A       High school.  I got some technical.

Q       Okay, now, let me look through file here.  Is your biggest problem your back?

A       Pretty much.  It's what's connected to everything else.   I've been told I have the osteoarthritis of a 60-year-old woman.  I wished it was stated somewhere in a piece of paper.

Q       Now, let's see here.  According to this, to the computer, you last worked in '03.  Is that true?

A       Yes, sir.

                      *           *           *

Q       Okay, now, let me just look here.  The biggest problem you have medically is your back and you knee, right?

A       Yes, sir, my right hip.  There's a MRI.  I've looked up words, so for the most part

I do kind of understand the paperwork and calcium deposits, some with arthritis, and there's an excessive amount of fluid in my right hip joint. MRI x-rays can't really show what exactly is wrong. There's not going to be a whole lot of, there's no broken bones. I mean, I got bone spurs. I've had surgery on my right knee from a on-the-job injury I received down in Carolina when I was hauling pigs. That's never been the same since. I've had carpal tunnel surgery done on both hands a few years back. I was told by a physician a year ago that the hand surgeon that I had do the surgery wasn't all that great. It's a little late now. I've got to have the surgery again or just go ahead and, you know, feel like someone is ripping them out of my body.

\*             \*             \*

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]  (Tr. 390)

Q      Now, Dr. Wells, do you need to, you don't know this lady.

A      No, I do not, Your Honor.

Q      Do you need to ask her any questions about her work history?

A      I don't believe so, Your Honor.

Q      What kind of jobs has she done in the past?

A      The work that she did in the past, as indicated at Exhibit 4E in the work history report, and she indicated in her testimony she drove, drove a dump truck and she also added she hung, worked in hanging guardrails and that sort of a thing between '98 and 2003. That work as performed was medium in exertion. That would be semiskilled work. She also was an over-the-road truck driver, as she indicated, with a CDL license between '91 and '93. That work as normally performed is medium in exertion, that work is semiskilled work. And, finally, in '89, the only part of the last 15 years that's indicated, she worked as a clerk in a convenience store.

And that work is light in exertion and that work is unskilled. And all that is consistent with the DOT.

Q        Would she have any skills that transferred to sedentary work?

A        No, she would not, Your Honor.

Q        What kind of sedentary jobs would there be that somebody could, couldn't use their hands on a continuous [INAUDIBLE]?

A        A person, given that location profile, particularly of a younger person who is a high school graduate, and with that work history, of the kinds of sedentary work that a person like that could do would be that of a dispatcher, like a non-emergency dispatcher such as at a trucking company. That work is sedentary is exertion. That work is entry level work. If there are any skills related to that work they'd be learned on the job. In the national economy there are 124,000 of those jobs. There are 1300 of those jobs in the State of West Virginia. In my opinion, excuse me.

Q        I was going to ask you, if somebody were in pain where they couldn't get up and go to work on a regular basis, they couldn't make it through a full day due to the pain, would they be able to do any of those jobs?

A        No. They wouldn't be able to any work, in my opinion, on a sustained basis.

Q        But if their pain [INAUDIBLE] control where they could concentrate on their job and work a full eight-hour day would they be able to do those jobs?

A        Given this locational profile that would be a, a good job for that that a person could do under those limitations.

CLMT        I have a question if I may?

ALJ   Sure, it's your turn.

CLMT   Thank you.  With the medication that I have had in the past all leaving me

with the grogginess and they didn't help with the pain.  But it doesn't do much.  I mean, they

ALJ   [INAUDIBLE].

CLMT   My question, I guess, would be am I going to be able to take medication

like I've been prescribed and still perform these jobs?

       *     *     *

[RE-EXAMINATION OF CLAIMANT BY ALJ]  (Tr. 391)

Q   Well, the answer is that if your medication prevents you from working or

concentrating and going to work and making you so groggy you can't concentrate on even

simple unskilled tasks then you would be disabled because of the side effects of your medicine.

A   Yes, sir.

Q   Okay.  That, that, we understand that.

A   Okay.

Q   The question is, are you taking any medicines now?

A   No sir, I'm trying, I had had medications through Dr. Bennett but she no longer

wants to see me.  And I've not had any money to try to go to another physician or a nurse

practitioner.  I've been to the hospital a couple of times, but, to the emergency room, but that's

pretty obvious, when I broke my wrist.

       *     *     *

HEARING #2: April 20, 2006

[EXAMINATION OF CLAIMANT BY ALJ]  (Tr. 397)

Q      Okay.  That's Dr. Pearis over there.  He's our vocational expert today.  Now, I told you last time you had a right to have an attorney with you but you didn't want one, is that right?

A      Yes, sir.

Q      Okay.   So you want to go ahead today without an attorney?

A      Yes, sir.

Q      Basically what I did is, I wanted you to come back here, this - - we had the hearing last summer - - because you had seen a number of doctors that we didn't the information on and I got all this information here and I wanted, I mean, it's a lot of new information and I wanted - -

A      I've seen several doctors.

Q      I wanted to give you a chance to say anything else you wanted to.  I see, are you still going down to see Dr. Hamm?

A      I haven't seen her in two months.  I'm scheduled to go back to see her, yes.

Q      And what medications are you taking now, Mrs. Sampson?

A      There, there's several that I've been taking.  They've been swap-, switching 'em around because of the making me sick.

Q      Does Dr. Hamm give you any medicine for your nerves?

A      She give me something told me it would take two or three months to start taking effect.

Q      What is that called?

A      Lacmital and Effexor.

Q       Uh-huh.  And what, what else are you taking?  Are you taking anything for your pain?

A       The only thing I'm taking now for pain is something that Dr. Clark over at the Rainelle Medical Center give me.  It's called Baclofen.

Q       Uh-huh.

A       And then Dr. Saikali in Beckley, he has - - it;'s a big word.

Q       What, what kind of doctor is the one in Beckley?

A       He is a rheumatologist.  I have tested positive for rheumatoid arthritis.  He's giving me something to help, help reduce my swelling in my joints and something to help me sleep.

Q       Is he the one who says you have fibromyalgia?

A       Yes, sir.

*               *               *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]  (Tr. 400)

Q       Dr. Pearis, could you classify this lady's work for us?  Do you need to ask her any questions?

A       No sir.  I think that there was a pretty description.  She's basically been a truck driver of one kind or another a, a good part of her working career.  She was a, the, the truck driver over the road is semi-skilled work performed at the medium exertional level.  She's also been - -

Q       She wouldn't have any transferable skills would she?

A       No, sir.

19

E.        Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

•        Tries to go outside daily.  (Tr. 124)

•        Drives a car.  (Tr. 124)

•        Goes on her own to the post office, store, pay phone, and the doctor's office.  (Tr. 124)

•        Prepares her own meals.  (Tr. 125)

•        Cooks breakfast and dinner daily.  (Tr. 125)

•        Cleans kitchen and bathroom and vacuums living room and bedroom and does laundry once per week.  (Tr. 125)

•        Grocery shops 3 to 4 times per month.  (Tr. 125)

•        Able to pay her bills.  (Tr. 125)

•        Painful to stand more than 10-15 minutes at a time.  (Tr. 125)

•        Does puzzles whenever she can.  (Tr 126)

•        Watches television 1.5 hours per day.  (Tr. 126, 143)

•        Listens to radio all day and night.  (Tr. 126)

•        Has no difficulty understanding or remembering what she reads, watches or listens to.  (Tr. 127)

•        Does not visit with people.  (Tr. 127)

•        Sleeps 1 to 3 hours per night.  (Tr. 128)

- Able to walk for 10 to 15 minutes at a time before pain sets in. (Tr. 140)

- Sometimes makes her bed. (Tr. 141)

- Washes dishes 3 to 4 times per week. (Tr. 141)

### III. The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant alleges the ALJ erred in finding her mental impairments were non-severe, failed in his duty to obtain additional medical evidence, and failed to consider the impact of her mental impairments on her ability to work. Claimant also alleges the ALJ's determination of her RFC is not supported by substantial evidence because he unreasonably rejected the opinions of Dr. Ahmed, Dr. Garner, Dr. Hay, and Dr. Bennett. Commissioner contends the ALJ's determination Claimant's mental impairments were not severe is supported by substantial evidence, the ALJ did not have a duty to obtain additional medical evidence, and the ALJ did consider the impact of her mental impairments on her ability to work. Commissioner also argues the ALJ's determination of Claimant's RFC properly reflected the medical opinions of the four physicians and is supported by substantial evidence.

B.    The Standards.

1.    Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 569(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party

opposing the motion. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2.    <u>Judicial Review</u>. Only a final determination of the Commissioner may receive judicial review. <u>See</u>, 42 U.S.C. §§ 405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.    <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. §§ 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.    <u>Social Security - Medically Determinable Impairment</u>. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.    <u>Disability Prior to Expiration of Insured Status- Burden</u>. In order to receive disability insurance benefits, an applicant must establish that he was disabled before the expiration of his insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.    <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to

make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

       7.     <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

       8.     <u>Social Security - Substantial Evidence - Defined</u>. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

       9.     <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not

have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.  Discussion

    1.    Whether the ALJ Erred in Finding Claimant's Mental Impairments Were Non-Severe, Failed in His Duty to Obtain Additional Medical Evidence, and Failed to Consider the Impact of Her Mental Impairments on Her Ability to Work.

Claimant alleges the ALJ erred in failing to find her mental impairments - anxiety and depression - were "severe."  Claimant alleges her mental impairments cause crying spells, anger, psychomotor retardation, difficulty sleeping, nervousness, and anxiety that significantly limit her ability to work.  She further alleges the ALJ failed in his obligation to obtain additional medical evidence of her mental impairments and failed in his duty to consider the impact of her mental impairments on her RFC.  Commissioner argues the ALJ's conclusion Claimant's mental impairments were not severe is supported by substantial evidence, that the ALJ did not have a duty to obtain additional medical evidence, and that the ALJ did consider the impact of her mental impairments on her ability to work.

An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities.  20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).  "The claimant's maladies must be considered in combination and must not be fragmentized in evaluating their effects."  Hicks v. Gardner, 393 F.2d 299, 302 (1968).  When evaluating whether a claimant's mental impairments are "severe," the ALJ must first determine whether the medical evidence shows a medically determinable physical or mental impairment exists which would

24

"reasonable be expected to produce the symptoms" alleged. 20 C.F.R. § 404.1529; SSR 96-7p. If the ALJ finds such an impairment exists, the ALJ must evaluate the "intensity, persistence, and functionally limiting effects" of the symptoms of the impairment to determine the impairment's impact on that individual's ability to work. SSR 96-7p. When determining a Claimant's RFC, the ALJ, in assessing RFC, must "consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." SSR 96-8p; 20 C.F.R. 404.1529.

The ALJ in the present case found Claimant suffered from the medically determinable mental impairments of anxiety and depression that were capable of causing her alleged symptoms. (Tr. 24). However, he found the impairments were non-severe. (Tr. 24). In coming to his conclusion, he relied on evidence that Claimant did not seek psychological or psychiatric mental health treatment or counseling until she began seeing Dr. Hamm in 2006, that she had no prior history of hospitalizations or outpatient treatment for any mental health problems, that her "activities of daily living have not been appreciable limited due to anxiety or depression," and that the DDS consultant in July 2006 concluded Claimant's mental impairment was not severe. (Tr. 24).

The Court finds the ALJ's conclusion that Claimant's mental impairments were non-severe is supported by substantial evidence. First, although the record documents Claimant's continued complaints and diagnoses of anxiety and depression, the record does not establish that her mental impairments significantly limit her ability to work. (Tr. 233-236, 238-239, 269-274, 309-311). Rather, the record shows Claimant retains the ability to prepare meals, watch television, listen to the radio, pay bills, run errands and that she no difficulty understanding or

25

remembering what she reads, watches or listens to. (Tr. 124-127). Additionally, mental health treatment records from Willow Ridge dated February 2006 indicate that although Claimant was diagnosed with anxiety disorder and noted to have a flattened affect, depressed mood, retarded psychomotor and scattered thoughts, she was also found to have normal speech, average IQ, normal memory, good insight, and normal judgment and was merely recommended to continue taking medications, continue individual psychotherapy, and learn stress management techniques. (Tr. 384-89). There was no indication in the Willow Ridge records, nor any medical records, that Claimant's mental impairments significantly limited her ability to work. Finally, the Court finds Claimant's failure to consistently allege disability arising from her mental impairments supports the ALJ's conclusion. Specifically, Claimant failed to allege in her two Disability Reports any disability arising from her mental impairments. (Tr. 9, 147). Claimant also failed to allege in her Daily Activities Questionnaire dated August 2003 any limitation arising from her anxiety or depression (Tr. 124). Similarly, in her Daily Activities Questionnaire dated March 2004, Claimant alleged her depression only eroded her interest in other activities, not that it effected her ability to work. (Tr. 140). Finally, Claimant failed to mention at either of the two hearings that her depression or anxiety limited her ability to work in any way.[6] Instead, her testimony at the hearing centered on pain and symptoms relating to her back, knee, and hand impairments. (Tr. 388, 399). In light of the above evidence, the ALJ reasonably relied on the

_____

[6] Although Claimant was unrepresented by counsel at both hearings, the Court finds it reasonable to rely on her failure to testify to limitations arising from her mental impairments. First, Claimant was well informed of her right to counsel and chose to proceed *pro per*. (Tr. 378-79, 397). Second, Claimant demonstrated her understanding of the nature of the proceedings by providing detailed testimony on her limitations arising from her back and hands. (Tr. 384, 388). Her ultimate failure to provide any testimony on limitations arising from her mental impairments is therefore significant.

DDS Physician's conclusions in July 2004 that although Claimant suffered from anxiety-related disorders and although Claimant was taking Xanax for anxiety, her mental impairment was not severe.[7]  (Tr. 240).  Dr. Bennet's conclusion Claimant was disabled for "lifetime" was irrelevant to the determination of whether Claimant's mental impairments were severe, because Dr. Bennett's conclusion was based on her physical, not mental, limitations.  (Tr. 27, 309).

The Court also finds the ALJ did not have a duty to obtain additional medical evidence because the  medical records were not "inadequate" for the purposes of determining whether Claimant was disabled.  See 20 C.F.R. § 416.912(e)(1);  Smith, 395 F. Supp. 2d 298 at 301; Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986) ["The ALJ has a duty to explore all relevant facts and inquire into issues necessary for adequate development of the record, and cannot rely on the evidence submitted by the claimant when that evidence is inadequate."].  Furthermore, there were no evidentiary gaps in the record that resulted in unfairness or clear prejudice such that remand was required.  Brown v. Shalala, 44 F.3d 931, 935-36, (11th Cir. 1995); Marsh v. Harris, 632 F.2d 296, 300 (4th Cir. 1980).  Rather, the medical record included a detailed overview of Claimant's history of anxiety and depression and clearly established Claimant's work-related abilities were not significantly limited by her mental impairments.  (Tr. 124-127, 233-236, 238-239, 269-274, 309-311).

Finally, the Court finds the ALJ fulfilled his duty pursuant to SSR 96-8p to consider the impact of Claimant's mental impairments, even though not severe, on her ability to work.  At the

_____

[7] Claimant alleges the ALJ's reliance on the DDS Physician's opinion is erroneous because the document indicates it was neither reviewed nor signed by a physician.  The Court is not persuaded by this argument because Claimant has failed to provide any evidence, other than her observations of the document, that anyone other than a DDS Physician completed the Psychiatric Review Technique.

outset of his RFC determination, the ALJ specifically stated, "in making this finding, I considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Tr. 25). The ALJ's detailed consideration of Claimant's mental impairments only one paragraph earlier convinces the Court the ALJ properly considered Claimant's mental impairment when determining her RFC. (Tr. 24). Additionally, at the conclusion of determining Claimant's RFC, the ALJ noted there was some evidence of non-severe mental impairments but concluded "none of the evidence demonstrates that the severity of the impairments, even when considered in combination, precludes all sustained gainful activity." (Tr. 27). Such a statement demonstrates the ALJ considered the impact of Claimant's mental impairments, alone and in combination with her other impairments, when determining her RFC. Finally, as explained below, the ALJ's ultimate determination of Claimant's RFC, including its omission of accommodation for Claimant's mental impairments, is supported by substantial evidence.

       2.     <u>Whether the ALJ's Determination of Claimant's RFC is Supported by Substantial Evidence and Whether He Properly Considered Medical Opinions When Determining Her RFC</u>.

Claimant alleges the ALJ's determination of her RFC is not supported by substantial evidence because the ALJ failed to consider limitations arising from her mental impairments and failed to consider limitations identified by Dr. Ahmed, Dr. Garner, Dr. Hay (the DDS Physician), and Dr. Bennett. Commissioner argues the ALJ properly considered the limitations arising from Claimant's mental impairments and properly considered the opinions of the afore-mentioned physicians.

At step four of the sequential analysis, the ALJ must determine the claimant's RFC. 20

C.F.R § 404.1520. The RFC is what a claimant can still do despite her limitations. Id. at §

404.1545. More specifically, it is an assessment of a claimant's functional limitations resulting

from medically determinable impairments (or combination of impairments) and includes the

impact of related symptoms such as pain. SSR 96-8p (1996). The determination of a claimant's

RFC is based upon all of the relevant evidence. 20 C.F.R. § 404.1545. Observations by treating

physicians, psychologists, family, neighbors, friends, or other persons of Claimant's limitations

may be used. Id. These descriptions and observations must be considered along with medical

records to assist the Social Security Administration to decide to what extent an impairment keeps

a claimant from performing particular work activities. Id.

  A treating physician's opinion will be entitled to controlling weight under some

circumstances. The opinion must be (1) well supported by medically acceptable clinical and

laboratory diagnostic techniques and (2) not inconsistent with other substantial evidence in the

case record. 20 C.F.R. § 416.972(d)(2). A treating physician's opinion will be disregarded if

persuasive contrary evidence exists. Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). An ALJ

may rely on the opinions of non-examining physicians, even when those opinions contradict the

opinion of a treating physician, if the opinions are consistent with the record. Gordon, 725 F.2d

at 235. Regardless of a physician's opinion, the ultimate legal determination of Claimant's

impairments remains with the Commissioner. 20 C.F.R. § 404.1527(d)(2); (e)(2); McLain v.

Schweiker, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ's findings will be upheld as long as

substantial evidence supports them. Hays, 907 F.2d at 1456.

  The ALJ in the present case concluded Claimant retained the functional capacity to

perform "sustained work at the sedentary level that does not require continuous use of the

hands." (Tr. 25). Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567.

Regarding Claimant's allegation the RFC fails to account for limitations arising from her mental impairments, the Court find's Claimant's allegation is without merit. As explained above, the ALJ considered symptoms of all of Claimant's impairments, severe and non-severe, when he determined her RFC. (Tr. 24, 25, 27). The ultimate lack of accommodation in the RFC for any of Claimant's mental impairments is supported by substantial evidence, namely her lifestyle evidence, her failure to allege disability based on mental impairments, her failure to testify at the hearing to any of the alleged limitations arising from her mental impairments, and the absence of medical evidence that her mental impairments limited her ability to work. (Tr. 124-127, 233-236, 238-239, 269-274, 309-311).

Regarding Claimant's allegation her RFC is not supported by substantial evidence because it fails to consider the limitations arising from Dr. Ahmed, Dr. Garner, Dr. Bennett and Dr. Hay, the Court finds Claimant's argument is without merit for three reasons. First, the ALJ specifically stated and his decision reflects he considered the opinions of all four physicians. (Tr. 26-27). Second, Claimant's RFC is consistent with Drs. Ahmed's, Garner's, and Hay's opinion that Claimant retains the ability to perform sedentary work as described in 20 C.F.R. § 404.1567. Specifically, all three physicians found Claimant could "frequently" lift 10 pounds. (Tr. 237, 253, 320). Furthermore, while Dr. Ahmed did not indicate any restriction on

Claimant's ability to walk and stand, Dr. Hay and Dr. Garner indicated Claimant could stand and sit for up to 6 hours in an 8 hour workday (Tr.237, 253, 320). Such restrictions are consistent with the restrictions of sedentary work. Finally, although Dr. Bennet concluded Claimant was disabled for her "lifetime" and therefore could not perform even sedentary work, his opinion is inconsistent with "substantial evidence" in the record, including the opinions of Dr. Ahmed, Dr. Hay, and Dr. Garner, and thus the ALJ reasonably rejected his opinion. See 20 C.F.R. § 416.972(d)(2)

Third, Claimant's RFC is consistent with opinions of all four doctors that Claimant has de minimis hand limitations. Dr. Ahmed and Dr. Hay both opined Claimant had no manipulative limitations on the use of her hands. (Tr. 237, 253). Dr. Garner, while concluding in October 2005 Claimant could only occasionally reach, concluded Claimant had unlimited restriction on handling, fingering, and feeling. (Tr. 320). Dr. Bennett, although concluding Claimant suffered from osteoarthritis, concluded she was disabled due to her inability to bend, lift, and carry, not any hand-related limitations. (Tr. 309).

The Court recognizes that the ALJ's determination of Claimant's RFC fails to account for any of the postural and environmental limitations identified by the four physicians. (Tr,. 237, 253, 309, 320). However, because postural and environmental limitations do not significantly erode the occupational base for a full range of sedentary work,[8] and because the ALJ's ultimate

---

[8] Pursuant to SSR 96-9p, "postural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work." Similarly, "few occupations in the unskilled sedentary occupational base require work in environments with extreme cold, extreme heat, wetness, humidity, vibration, or unusual hazards." SSR 96-9p.

conclusion Claimant is not disabled is supported by substantial evidence, the Court finds the ALJ's arguably thin RFC does not warrant remand. See SSR 96-9p.

Based on the above evidence, the Court finds the ALJ's determination of Claimant's RFC is supported by substantial evidence and sufficiently reflects the opinions of Dr. Ahmed, Dr. Hay, Dr. Garner, and Dr. Bennet to the extent their opinions are consistent with the record as a whole. 20 C.F.R. § 416.972(d)(2)

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be DENIED because the ALJ properly determined Claimant's mental impairments were not severe, did not have a duty to obtain additional medical evidence, and properly considered the impact of Claimant's mental impairments on her ability to work when determining Claimant's RFC. Additionally, the ALJ's determination of Claimant's RFC is supported by substantial evidence, including the opinions of Drs. Ahmed, Hay, and Garner.

2.      Commissioner's Motion for Summary Judgment be GRANTED for the same reasons stated above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment

of this Court based upon such Report and Recommendation.


DATED: December 3, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE